Per Curiam :
This case was referred to Trial Commissioner Joseph V. Colaianni with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on January 6, 1972. Both parties filed exceptions to the commissioner’s opinion, findings of fact and recommended conclusion of law and the case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court agrees *177 with the commissioner’s opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover reasonable and entire compensation in the sum of $41,000, plus interest (on $25,000) at the rate of 4 percent from March 1, 1971, to the date of payment and judgment is entered for plaintiff accordingly.
OPINION OE COMMISSIONER
Colaianni, Commissioner:
In Yosemite Chemical Co. v. United States, 175 Ct. Cl. 623, 360 F. 2d 948, 149 USPQ 635 (1966),[1] this court held claims 1-5 of Smith U.S. Patent 2,603,226 to be valid and infringed. Trial was held to determine, pursuant to 28 U.S.C. § 1498, plaintiff’s “reasonable and entire compensation.” On the basis of the evidence presented at trial, fully set forth hereinafter in the findings of fact, and for reasons which follow, I conclude that plaintiff is entitled to recover: $25,000, as damages for the Government’s unauthorized use of the patented invention; $16,000, as delay damages, measured as interest (at 4 percent per annum) from the time of the unauthorized use up to March 8, 1971; and additional interest (at 4 percent per annum) from March 8, 1971, to the date of payment.

Background facts

The patent in suit, hereinafter referred to as the Smith patent, relates to a process for preserving and/or removing accumulations of rust, scale, marine growth and the like from ballast tanks of marine dry docks and ships. (Findings 5, 6, 7 and 8.)
Claims 1 through 5 (claims 1 and 5 are set out in Finding 4) of the patent define a two-stage process for the removal of foreign materials from metal surfaces. The first stage requires the use of an emulsifying agent in oil (Part A of the two-part flotation compounds) capable of forming with water a water-in-oil viscous gel emulsion. The gel, by *178 its inherent swelling characteristics, mechanically breaks the bond between the rust, scale, etc., with which it comes in contact and the metal surface. The second stage calls for the use of an oil soluble thinner (Part B of the two-part flotation compounds) to reduce the viscosity of the gel emulsion and thus permit it and the rust, corrosion, etc., adhering to it to be loosened and removed from the metal surface.

Relevant accounting period

The parties originally stipulated that the recovery period was to be limited to the six-year period of September 8,1952, to September 8, 1958. However, for convenience, plaintiff concedes that procurement of the two-part compounds by defendant substantially ceased by September 8, 1957. Accordingly, for purposes of this suit, the recovery period is limited to the five-year period September 8, 1952, to September 8,1957. (Findings 8 and 19.)

Governments infringing use

Plaintiff filed its petition on February 14, 1958, charging defendant with infringement. However, this court, similar to the practice of other federal courts in patent cases, only allows formal discovery of relevant procurement data after a patent has been found to be valid and infringed. Accordingly, it was not until after May 18, 1966,[2] that plaintiff could formally obtain discovery concerning procurement by the Government of two-part flotation compounds. In 1966, plaintiff was faced with trying to obtain procurement records that were 9 to 14 years old.
It is, of course, well known that the United States Government does not have unlimited space for the storage and preservation of records. Procurement records of the type with which we are here concerned, unless they were clearly marked for retention, would have been destroyed under the defendant’s systematic document destruction program long-before they became 9 years old. In this case, only plaintiff’s earlier attempt to settle its claim of patent infringement by *179 an administrative claim prevented all of the pertinent procurement records from being destroyed.
From the start of the accounting proceeding, plaintiff was dissatisfied with the procurement records supplied by defendant. An attempt was made in 1969 to obtain the relevant and necessary procurement data from defendant’s supplier. Unfortunately, after a search of its corporate files, Eureka Chemical Company reported that its records for the pertinent years had been destroyed.[3]
Defendant is willing to calculate the number of gallons of Eureka two-part compounds which it used in carrying out plaintiff’s patented process by supplementing the number of gallons that its records in evidence clearly establish with estimates from plaintiff in the following instances:
(a) Where defendant’s records fail altogether to show a use of Eureka two-part compounds and plaintiff’s records not only allege such a use, but indicate the number of gallons allegedly used; and
(b) Where plaintiff’s estimates of the number of gallons used for a particular dry dock or ship are higher than defendant’s records indicate.
As a result of this compromise, defendant admits to the procurement of 167,850 gallons of Eureka two-part flotation compounds during the relevant accounting years. (Finding 29.)
However, defendant’s procurement records, which form the basis for its estimate, are obviously incomplete. For example, the procurement records of a significant number of the vessels and dry docks which defendant admits were authorized to use two-part compounds are not in evidence. (Findings 23-31.) An even poorer showing results when the procurement records of the accounted-for ships and dry docks are compared to the number of ships and dry docks that were capable of using such compounds. (See Findings 21-31.) In addition, possibly because the ships and dry docks which used two-part flotation compounds failed to report all such usage, and/or possibly because of the failure of defendant to uncover and/or preserve all reported usage, it is highly *180 questionable if tbe records in evidence of the accounted-for ships and docks are complete and reliable. (See Findings 24-25.)
In sum, since the procurement records in evidence fall somewhat short of accurately reflecting the number of gallons of Eureka two-part compounds used on the accounted-for ships and dry docks, and since procurement records for a significant number of the ships and dry docks that were actually authorized to use two-part compounds have not been furnished, I conclude that defendant actually procured and used about 400,000 gallons of Eureka two-part flotation compounds during the relevant accounting years. (Finding 31.)

Reasonable and, entire compensation

Plaintiff urges that compensation should be calculated on the basis of the cost savings to the Government. While, as defendant points out, this court has not' used cost savings as a basis for calculating compensation for some years,[4] it is apparent that this is only because a proper case where such a basis could be used has not occurred. Plaintiff’s argument that this is a case in which to use cost savings as a basis to calculate its recovery is not convincing. Indeed, plaintiff has failed to present persuasive facts which would permit a determination of the cost savings inuring to the defendant’s benefit as a result of its use of plaintiff’s patented process. Plaintiff’s attempt to arrive at the savings to defendant by comparing what it would have cost the Government to treat the ballast tanks of its ships and dry docks with a bituminous emulsion, to what it would have cost the Government to treat the same tanks by use of plaintiff’s patented process, is unconvincing. (Findings 36-41.) Plaintiff’s comparison unrealistically shows a large saving by defendant.
Plaintiff’s argument would have been far more convincing if it had attempted a comparison in costs between plaintiff’s process and representative, competitive, noninfringing flotation-type processes available at the time of the infringing *181 acts. (See Findings 9-20.) There is no doubt that noninfring-ing two-part flotation compounds were available during the entire relevant accounting period. Indeed, this court found that defendant did not infringe plaintiff’s patent through the use of ClearMn Chemical Company’s two-part compounds in carrying out the process of claims 1-5. Also, defendant would not have infringed plaintiff’s patent by the use of one-part flotation compounds in carrying out the processes disclosed by claims 1-5 and 7. Certainly, the evidence establishes that defendant ultimately turned to a process which utilized one-part compounds in preference to plaintiff’s process as set forth in claims 1-5 and which required two-part compounds. (Finding 18.)
Finally, since the cost of the available noninfringing flotation compounds was competitive with Eureka two-part compounds, the cost savings to the Government as a result of its use of Eureka compounds in performing the process called for by claims 1-5 of the Smith patent would have been significantly, if not totally, eliminated.
Because of the difficulty in determining what “reasonable and entire compensation” should be in a given case, this court has always looked to see if a plaintiff through commercial dealings and licensing has established a royalty rate for its patented invention. In those instances where a patentee has an established commercial royalty rate, that rate will at least be the starting point for determining what a reasonable royalty rate for the Government shall be. In this particular case, the evidence shows that plaintiff did not enter into any industrial licensing agreements. (Finding 38.)
In the absence of an existing royalty rate, courts often resort to a “willing seller — willing buyer” approach to establish what a reasonable royalty should be under the particular facts with which they are faced.[5] In effect,- this requires the synthesization of a hypothetical negotiation at the time of defendant’s infringement, see Ushakoff v. United States, 179 Ct. Cl. 780, 785, 153 USPQ 410, 375 F. 2d 822 (1967).
*182 In. the end, what is being attempted is to establish what the parties would have agreed upon, if both were reasonably trying to reach an agreement. Factors which are pertinent-to such a determination include the nature of the invention, its utility and advantages, and the cost savings expected by the use of the invention.[6] In sum, this approach attempts to consider all reasonable factors that each side would urge to advance its own best interests in an arm’s-length negotiation. However, quite significantly, this hypothetical approach has the advantage of considering facts which in an actual negotiation would not have as yet occurred and would thus be, at best, speculative. In the words of Justice Cardozo:[7]
This is not a case where the recovery can be measured by the current prices of a market.
❖ ❖ sfs
But the absence of market value does not mean that the offender shall go quit of liability altogether. The law will make the best appraisal that it can * * * command.
$ * $ $ #
At times the only evidence available may be that supplied 'by testimony of experts as to the -state of the art, the character of the improvement, and the probable increase of efficiency or saving of expense.
This will generally be the case if the trial follows quickly after the issue of the patent. But a different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within.
It thus becomes necessary in this case to try to balance on the one hand such factors as the duration and extent of use by defendant of plaintiff’s patented process, and the availability, during the time of defendant’s taking, of non-infringing one-part and two-part compounds which defendant could have used to preserve its ballast tanks; against, on the other hand, factors which include defendant’s undeniable *183 use of plaintiff’s patented process and Eureka two-part compounds during tbe relevant accounting years and any advantages in utility and cost savings which inured to defendant from the use of plaintiff’s invention.
Taking all such factors into consideration, it is felt that had the parties entered into negotiations for a license to use plaintiff’s invention on the basis of about 400,000 gallons of two-part compounds, at a cost of $1.25 per gallon, or a total cost of $500,000, they may well have agreed upon a royalty at the approximate rate of 5 percent of the total dollar procurement. On this 'basis, plaintiff’s compensation should be $25,000. (Finding 43(a).)
Plaintiff is also entitled to delay damages as part of its reasonable and entire compensation. Plaintiff urges that the interest rate used in calculating its delay 'damages should be 6 percent per annum. However, plaintiff offered no evidence and submitted no proof to establish a rate greater than the 4 percent rate which has been allowed by this court for many years. In the absence of such a showing, plaintiff’s delay damages are to be calculated at the rate of 4 percent per annum of the reasonable compensation, see Confederated Salish & Kootenai Tribes v. United States, 193 Ct. Cl. 801, 805, 437 F. 2d 458, 460 (1971).
Accordingly, plaintiff is entitled to delay damages, measured as interest at 4 percent per annum, from midway in the accounting period (March 8, 1955) to the date of payment. (Finding 43(b).)
FINDINGS of Fact
1. On May 13, 1966, the court held that claims 1 through 5, inclusive, of Smith U.S. Patent 2,603,226 were valid and infringed by defendant’s use of Eureka Chemical Company’s two-part flotation compounds E-220 and E-221, Part A and Part B, respectively, and that plaintiff was entitled to recover reasonable and entire compensation pursuant to 28 U.S.C. § 1498.175 Ct. Cl. 623, 360 F. 2d 948.
2. The court also held, at pp. 632-33, 360 F. 2d at 953-54, that:
The Clearkin composition “Corrosion Battler A” [Part A of Clearkin’s two-part flotation compounds] *184 does not in effect contain any “soap of a divalent metal,” and this compound therefore cannot be said to infringe the Smith patent claims, all of which are specifically directed to emulsifying agents comprised of a fatty acid or organic soap of a divalent metal.
# * * * *
Defendant’s use of the Clearkin Chemical Company’s composition “Corrosion Battler A” [and Texaco Float Coat] is found not to come within the invention defined in claims 1 through 5 of the Smith patent.[1]
No review of the court’s decision was requested by plaintiff. Accordingly, plaintiff’s urging during the accounting trial, and in its post-trial brief on accounting, that defendant be held accountable for use of Clearkin two-part compounds, is untenable.[2]
3. Plaintiff filed its petition on February 14, 1958. However, while 28 U.S.C. § 2501 permits the accounting period to extend back six years to February 14, 1952, the parties by stipulation have set the beginning of the accounting period as 'September 8, 1952. Since the Smith patent issued on July 15, 1952, it did not expire until July 15, 1969. *185 Nonetheless, plaintiff indicates that it will accept September 8, 1957, as the terminal date of the accounting period. The evidence clearly shows that by September 8, 1957, defendant 'had terminated its procurement of Part B of the two-part flotation compounds. Thus, recovery is limited to the five-year period of September 8, 1952, through September 8, 1957.
4. Claims 1 and 5, which follow, are typical of plaintiff’s invention:

Qlaim 1

The process for removing material such as rust, scale and the like from a metal surface comprising the steps of: filling the interstices in said material and between said material and said surface with an emulsifying agent in oil, said agent comprising a fatty acid soap of a divalent metal automatically adapted to and capable of forming with water a water-in-oil viscous gel emulsion adapted to expand during its formation; providing the water to the agent so filling said interstices; permitting the formation of said gel emulsion in said interstices whereby its expansion during said formation will tend to loosen said material from said surface; thinning said gel with an oil soluble thinner capable of reducing the viscosity of the gel to facilitate its removal from said surface together with the material so loosened from said surface.

Claim 5

The process for removing material such as rust and scale from the metal side walls of a container that comprises the steps of: providing a body of water against said walls, floating an emulsifying agent in oil on the surface of said body and in contact with said walls, said emulsifying agent being an organic soap of a divalent metal having the characteristic of adhering to said walls together with water upon raising and lowering the level of said body and of forming a water-in-oil emulsion with said water after it has so adhered to said walls, raising and lowering the level of said body to cause said adherence and coating of said walls and the said formation of said emulsion on said walls, said emulsion having the further characteristic of being expansible during its formation whereby its said expansion between the metal surface of said walls and any of said material will force said material from said walls and into the emulsion coating said walls, then reducing the viscosity of said emul *186 sion bj applying an oil soluble agent thereto, said agent being capable of reducing the viscosity of said emulsion so that the emulsion and any of said material will fall from said walls.
5. Summarizing, patent claims 1 through 5 define a rust or scale removal process which comprises two basic steps. The first step requires the use of an emulsifying agent, Part A, comprising a fatty acid soap of a divalent metal which will form with water a water-in-oil gel emulsion between the rust and the surface to be cleaned. As a result of its inherent swelling characteristics, the gel mechanically breaks the foreign material from the surface being cleaned. The second step includes the use of an oil soluble thinner, Part B, which is capable of reducing the viscosity of the gel emulsion formed during the first step. Consequently, the emulsion and the foreign material, rust, etc., adhering to it may be easily removed from the surface being cleaned.
6. The corrosive effect of salt water on metal surfaces is well known. The Navy has over the years devoted a considerable amount of time and money to combating the corrosive effect of salt water on its ships and marine structures. Within the general area of corrosion prevention and control, the United States Navy, in the early and mid-1950’s, was especially interested in finding an economical and efficient way of arresting corrosion in ballast tanks. Ballast tanks are used in the day-to-day operations of amphibious ships and metal floating dry docks.
7. The flotation compartments or ballast tanks of marine dry docks and amphibious ships are alternately filled and emptied with surrounding water. Eepetitive ballasting of surrounding water into and out of the tanks results in the formation of rust and scale on the inner metallic surface of the compartments and ultimately diminishes their efficiency and useful life.
8. Flotation compounds were felt to be particularly suited for preservation of ballast tanks 'because they could be easily applied to the insides of the tanks, and, also, because the unwanted scale, rust, or foreign material, could be easily removed by flushing or ballasting the tanks. The flotation *187 compounds were intended to float upon the surface of the ballasting water. Accordingly, with each drawing of surrounding water into a storage compartment, the flotation compound was applied to the inner surface of the tank or compartment. This coating process was, of course, repeated upon the stored water being discharged from the ballast tank. To insure that the flotation compound was not discharged with each tank ballasting, it was intended that a shallow layer of water remain inside the tank at all times. Thus, the compounds Which floated on top of .the water remained in the tank to be reapplied to the inner tank surfaces with each ballasting operation. Nonetheless, it was contemplated that small amounts of the compounds would be added from time to time in order to maintain the proper amount and correct consistency of the coating.
9. To establish plaintiff’s “reasonable and entire compensation,” it is essential to determine, inter cilia, what plaintiff’s patented process contributed to the art of removal of rust, scale, dirt, etc., from ballast tanks. It is especially necessary to compare plaintiff’s process to alternate methods which were available at the time of defendant’s infringement to establish if plaintiff’s process achieved improved results, was more economical to carry out, or was otherwise advantageous.
10. The evidence shows that one of the earliest methods known to the Bureau of Yards and Docks for treating the ballast tanks of metal dry docks consisted of the time-consuming and costly procedure of first removing the scale or rust by scraping, chipping and/or sand blasting, and then painting the cleaned surface.
11. The Bureau of Ships, on the other hand, appears to have used a number of ballast tank treatment processes in connection with the tanks used on its ships. These include:
(a) First applying two coats of anticorrosive Formula 14 or 14N to the surface to be treated, and thereafter applying, at a temperature as high as 400° F., a heavy coat of white plastic known as Formula 89. However, because of fire hazards and other difficulties associated with the application of the white plastic Formula 89, the process was not widely used.
*188 (b) One of the most widely used processes called for the application of two coats of bituminous emulsion to the surfaces to be preserved. A 1956 memorandum prepared by Mr. L. S. Bimbaum, one of defendant’s chief witnesses at the trial, states:
Eeports received from forces afloat indicated that bituminous emulsion coating was unsatisfactoiy for the purpose, and corrosion continued to be a major and costly problem.
(c) The unsatisfactory results obtained from the use of bituminous emulsion convinced the Bureau of Ships, in May of 1953, to discontinue its use. Saran coating was, concurrently with the discontinuance of bituminous emulsion, being considered as an alternative tank preservative. Evaluating the effectiveness of saran coating, Mr. Birnbaum’s memorandum states:
While saran coating provided the best protection, it was recognized that the initial cost was high and represented so large a fraction of the funds available at each regular overhaul that preservation with this coating was in most instances not permissible. Accordingly, the search for a more satisfactory method of preservation continued.
12. The earliest evidence of Government interest in the use of flotation compounds for protection of its dry docks against corrosion appears to have occurred at the Naval Industrial Eeserve Facilities Branch, San Bruno, California. As a result of an investigation into the use of plaintiff’s process on floating dry docks at San Bruno, Mr. Horace L. Miller, the manager of that facility, was presented with a Certificate of Award for Meritorious Civilian Service. The actual date of the award is not of record, but Mr. Miller’s investigation was conducted in 1946.
13. Some years later, and perhaps as early as December 1951, the Bureau of Ships learned of the Bureau of Yards and Docks’ interest in plaintiff’s process for preservation of ballast tanks on floating dry docks. Mr. Birnbaum’s 1956 memorandum, in commenting on this, states:
The use of a proprietary product, “Yosemite” in ballast tanks of floating drydocks was concurrently brought to *189 the attention of the Burean [of Ships]. Based on experience by the Bureau of Yards and Docks, this material appeared to offer promise, particularly in connection with the problem of application.
(a) Evaluation of plaintiff’s tank treatment process in connection with a small number of Tank Landing Ships (LST’s) 602, 1083 and 1138; Dock Landing Ships (LSD’s) 5, 18, 23 and 26; and Medium Landing Ship (LSM) 419, of the amphibious fleet, was authorized on July 23, 1952. The results of this limited testing appear to have showed promise, for Mr. Birnbaum’s memorandum states:
Based on early results, service tests were extended to other LSTs and LSDs.
14. During the time that it was evaluating plaintiff’s two-part flotation compounds (sold under the trademark Yosemite), the Bureau of Ships learned of the Bureau of Yards and Docks’ use of two-part compounds supplied by ClearMn Chemical Company and Eureka Chemical Company for ballast tank preservation. As a result, the Bureau of Ships became interested in the flotation compounds produced by all three companies for use on its ships.
15. However, the Navy’s interest in flotation compounds was not limited to two-part compounds. For, in addition to two-part compounds, the Bureau of Ships, in mid-1953 was evaluating the effectiveness of one-part flotation compounds. Mr. Birnbaum’s early memorandum on the subject states:
Laboratory tests initially authorized at Engineering Experiment Station for Yosemite were extended to include Eureka and Corrosion Battler [Clearkin Chemical Company’s product] in connection with two part compounds. Tests were also authorized for evaluation of one part compounds, including Texas Company Floatcoat, Dearborn Chemical Company No-Oxide #519, and Valvoline Oil Company Tectyl #206. The laboratory was also requested to develop a specification for flotation type compounds.
16. The evidence of record shows that the Bureau of Ships promulgated detailed specifications and instructions on the treatment of ballast tanks with two-part flotation-type com *190 pounds. A review of these instructions is of particular interest.
(a) On February 10, 1954, BuShips Instruction 9190.12 was promulgated by the Chief of the Bureau of Ships and transmitted to the commanders of amphibious and service forces. The instruction established guidelines for the use of two-part compounds that were intended to be:
* * * applicable to all active ships upon which the subject compounds [two-part flotation compounds] have been approved for ballast tank preservation.
The instruction required that a standardized evaluation report form be submitted at six-month intervals for three years by the commanding officers of all ships using the two-part compounds. Copies of BuShips Instruction 9190.12 were sent to the commanding officers of 19 LST’s, 8 LSD’s, LSM-419 and the USS Consolation (AH-15).
(b) On June 11, 1954, the Bureau of Ships issued change 1 to BuShips Instruction 9190.12. This change order is significant because it shows a recognition by the Navy of the effectiveness of both one-part and two-part flotation compounds for preserving ballast tanks. Change 1 states:
Reports received to date indicate that flotation rust-preventive compounds, both one-part and two-part, may be equally capable of reducing salt water ballast tank corrosion.
Copies of change 1 were not only sent to the commanding officers of the 19 LST’s, 8 LSD’s, LSM-419 and the USS Consolation, who received BuShips Instruction 9190.12, but to the commanding officers of 30 additional LST’s and 7 additional LSD’s. Substantially all of the ships which received copies of change 1 filed one or more rust preventive evaluation reports manifesting a use of two-part flotation compounds.
17. On December 8,1955, Mr. Birnbaum prepared a letter for the Chief of the Bureau of Ships. The letter was sent to the commanding officer of the U.S. Navy Field Supply Office and indicated, inter alia, an intention by BuShips to *191 competitively procure a four-month, supply of two-part flotation compounds for stockpiling at the following facilities:
long Beach Naval Shipyard_ 12,375 gallons
Mare Island Naval Shipyard_ 16,500 gallons
Naval Supply Depot, Seattle_ 9,900 gallons
Naval Repair Facility, San Diego_ 8,800 gallons
Naval Supply Center, Norfolk_ 30,250 gallons
18. On September 14,1956, BuShips Instruction 9190.12A was promulgated. This instruction cancelled BuShips Instruction 9190.12 of February 10, 1954, and discontinued the six-month evaluation reports established thereby.
The instruction is also significant since it documents the displeasure of the Navy with Part B of the two-part flotation compounds. The displeasure by the Navy, to the point of urging the discontinuance of the procurement and use of Part B of the two-part compounds, is expressed thusly:
Laboratory tests indicate that part B of Type II corm pound does not contribute sufficiently to corrosion protection to warrant its continued procurement. Therefore, its use will be discontinued upon depletion of present stocks.
19. Also of interest in establishing the proper factual background to gauge plaintiff’s contribution and establish its “reasonable and entire compensation” is a July 29, 1957, letter from the Chief of the Bureau of Ships to the commanders of the Atlantic and Pacific amphibious fleets. This letter, which chronologically follows BuShips Instruction 9190.12A, documents the types of flotation compounds that were to be applied or already had been applied to the ballast tanks of newly constructed LSD’s-28 through 35. The letter indicates that Part B [E-221] of the two-part Eureka compounds was applied to LSD-34 during October of 1956. The month of application of the Part B compound was, of course, after the Navy’s September 14, 1956, order which discontinued its use. However, a reasonable explanation appears to be the normal time lag between the promulgation of an order and the effective execution of it. Where we are dealing with a fleet of ships that may have been scattered across the entire world, the time lag appears reasonable. It should be *192 noted that the letter indicates that only Eureka compound Part A [E-220] was applied to LSD-35 in February of 1957. Thus, it appears that procurement of Part B compounds was substantially discontinued in September 1956 following BuShips Instruction 9190.12A, and certainly by September 8, 1957.
Significantly, this appears to conform with plaintiff’s own conclusion that:
The recovery period began September 8, 1952 (by stipulation) and for convenience may be considered to have ended. September 8, 1957, since there are scarcely a dozen reports in the PXAC9 series as late as that date.
A review and comparison of BuShips Instruction 9190.12 of February 10, 1954, and a November 12, 1957, BuShips Instruction 9190.12B support this conclusion. The 1954 document contains a series of tables which instruct the commanding officers on the number of gallons of both Part A and Part B compounds that were to be used for effective preservation of ballast tanks on LST’s-1 through 1152 and LSD’s-1 through 27. On the other hand, the November 1957 BuShips Instruction 9190.12B indicates only the number of gallons of Part A compound which was required for effective treatment of the ballast banks for the same LST’s and LSD’s.
20. In summary, the evidence showá that defendant could have substituted one-step flotation-type products in place of Eureka Chemical Company’s products for preservation of ballast tanks on its floating dry docks or ships. Furthermore, the testimony establishes that the Navy considered Part B of the two-part flotation compounds to be ineffective and discontinued the use of two-part compounds as required by plaintiff’s process claims 1 through 5 in late 1956 or 1957.
The evidence shows that the Navy gained no particular advantage from the use of Eureka two-part compounds and that it would have been no hardship for defendant to stop the procurement of Eureka compounds altogether and substitute in their place any of the competing, noninfringing one-part or two-part compounds.
In addition, a number of nonflotation methods, such as saran coating, was also available for use by defendant for preservation of its ballast tanks.
*193 21. The record establishes that flotation compounds could have been used to treat the ballast tanks of the following dry docks and ships in defendant’s amphibious and service fleets:
(a) Large auxiliary floating dry docks (hereinafter referred to as AFDB’s);
■(b) Small auxiliary floating dry docks (hereinafter referred to as AFDL’s);
(c) Auxiliary floating dry docks (hereinafter referred to as AFDM’s);
(d) Hospital ships (hereinafter referred to as AH’s);
(e) Floating dry docks (hereinafter referred to as ABD’s);
(f) Dock landing ships (hereinafter referred to as LSD’s);
(g) Medium landing ships (hereinafter referred to as LSM’s);
(h) Tank landing ships (hereinafter referred to as LST’s);
(i) Medium auxiliary dry docks (hereinafter referred to as TFD’s);
(j) Floating dry dock working hulls (hereinafter referred to as YRDH’s); and
(k) Floating dry dock working machinery (hereinafter referred to as YBDM’s).
22. The following Navy vessels and dry docks, equipped with ballast tanks treatable with flotation-type compounds, were in active service during the relevant accounting years:

Number of Active Vestele

Vessel 1952 1953 1954 1955 1956 1957
AEDB. 114 11 0
AEDL. 17 17 22 17 19 18
AEDM. 2 2 2 2 2 2
AH... 3 3 3 2 1 1
ARD. 17 18 20 15 15 15
AEDM.. 0 0 0 0 0 0
LSD. 21 21 23 25 26 26
LSM. 22 22 21 10 7 6
LST. 95 96 110 106 56 62
YED. 0 0 0 1 1 1
YRDH.. 2 112 1 1
YEDM. 3 110 0 0
Total. 183 182 207 181 129 132
*194 23. An analysis of tlie evidence indicates that defendant’s procurement records for flotation compounds are incomplete. For example, some 110 LST’s were in service during 1954, yet procurement records for only 32 LST’s were introduced into evidence. A review of the available procurement records against the LST’s that defendant admits were authorized to use two-part compounds is equally unimpressive. For while defendant admits that two-part flotation compounds were authorized on 59 LST’s during the relevant years, procurement records for only 82 LST’s were introduced into evidence. Defendant does not contend that flotation compounds were not used on the unaccounted-for 27 of the authorized LST’s, but only that Navy records regarding use or nonuse of two-part compounds on these 27 LST’s have not been found.
24. Furthermore, the flotation compound usage records of the accounted-for 32 LST’s do not appear to be complete. Specifically, while in rare instances as many as six or seven reports from a particular LST are available, the average appears to be about two reports for each of the reporting LST’s. Of course, the commanding officers of the ships on which the compounds were being used were under orders, during the period of February 10, 1954, to September 14, 1956, to report such usage at six-month intervals. (See Finding 16(a).)
25. Procurement records concerning the use of flotation compounds on LSD’s in active service during the pertinent years are considerably better. Defendant admits that between 21 and 26 LSD’s, upon which flotation compounds could have been used, were in active service during the years in question. Moreover, defendant supplied procurement records which showed the use of flotation-type compounds on 26 LSD’s. However, because of the small number of records in evidence, there is some doubt that the procurement records for the 26 accounted-for LSD’s accurately and completely reflect the type and actual amount of two-part flotation compounds used.
26. With the exception of flotation compound procurement reports for LST’s and LSD’s, the parties introduced sub *195 stantially no reports to indicate the type of flotation compounds used or the number of gallons procured for use on the remaining several hundred dry docks and vessels which were in service during the relevant accounting years (Finding 22) and whose ballast tanks were capable of being treated by such compounds.
27. Even more important is the lack of procurement records for the following ships and dry docks that defendant admits were authorized to use two-part flotation compounds during the relevant years:
(a) L'SM-419
(b) AH-15
(c) AFDM-1,2,3,7,8,9 and 10
(d) AFDL-1,3,8,9,15,16,19,29,30 and 47
(e) YFD-7,68,69,70 and 71
(f) AKD-15,18 and29
28. Anticipating the difficulties involved in attempting to accurately establish procurement which occurred from 12 to 17 years before, on March 14,1969, the trial commissioner ordered defendant to request both Eureka Chemical Company and Clearkin Chemical Company to submit records of their sales of two-part flotation compounds to the Navy for the relevant accounting years. By letter dated March 17, 1970, Eureka Chemical Company responded that a search of corporate documents was conducted, but no relevant records were found.
Clearkin Chemical Company, on December 23, 1967, did supply information concerning the number of gallons of two-part compounds that it had sold to defendant during the relevant years. However, because of this court’s previous determination that use of such compounds by defendant does not infringe any of the claims in plaintiff’s Smith patent, no use is made of such information. (See Finding 2.)
29. Defendant, based on procurement records submitted into evidence, admits to the procurement and use of 101,410.5 gallons of Eureka compounds on vessels or dry docks for the relevant accounting period of September 8, 1952, through September 8,1957. Defendant admits to the use of these com *196 pounds in treating ballast tanks on: LST-228,602,1083 and 1096; LSD-16,17,18,19, 22, 30, 32, 34 and 35. In addition, defendant has agreed to accept plaintiff’s estimate of 22,101 gallons of Eureka compounds being used in connection with the preservation of ballast tanks on floating dry dock AKD-29. Finally, defendant agrees to a calculation of the number of gallons of Eureka compounds used during the relevant years by “giving the benefit of any higher figure [of use] to plaintiff.” As a result, defendant agrees to having procured and used 167,850 gallons of Eureka two-part compounds in treating the ballast tanks of the above ships and dry docks during the relevant accounting period.
30. Defendant’s estimate of the number of gallons of Eureka two-part compounds is not convincing because:
(a) It is based on records that are incomplete;
(b) Defendant introduced no documents concerning the type and number of gallons of two-part compounds that were used on the following ships and dry docks that it admits were authorized to use such compounds: LSM-419; AH-15; AFDM-1,2, 3,7, 8, 9 and 10; AFDL-1, 2, 3, 8, 9, 15, 16, 19, 29, 30 and 47; YFD-7, 68, 69, 70 and 71; ARD-15, 18, and 29; and
(c) Defendant has admitted that two-part flotation compounds were authorized for use on 59 LST’s during the relevant years, yet procurement records for only 32 of the LST’s so authorized were introduced into evidence.
31. Therefore, since the reports for the ships that defendant has introduced procurement records for are incomplete, and, also, since only about half of the number of ships and dry docks which were authorized to use two-part compounds were accounted for, I conclude that defendant actually procured and used about 400,000 gallons of Eureka compounds during the relevant years.
32. Several of defendant’s witnesses testified that compensation to plaintiff should in this case be made on the basis of a reasonable royalty.
33. While plaintiff has never granted an express license authorizing the use of its patented invention, plaintiff freely admits that purchasers of two-part compounds produced by *197 it were implicitly licensed under the Smith patent. Plaintiff further admits that the price of its two-part flotation compounds included a royalty for the use of the patented process. However, plaintiff did not indicate how much of the per gallon cost was allocable to the royalty.
34. The parties have stipulated for purposes of this proceeding that the cost per gallon for both Part A and Part B of the two-part compounds is $1.25.
35. Defendant argues that plaintiff’s compensation should be limited to a royalty of 2-3 percent of its total dollar procurement of Eureka two-part compounds. Therefore, on the basis of having procured 167,850 gallons of Eureka two-part flotation compounds, at an average cost of $1.25 per gallon, defendant is willing to compensate plaintiff a maximum of $6,294.36, exclusive of interest.
36. Plaintiff, on the other hand, contends that compensation in this case should be based on a percentage of what defendant saved by using plaintiff’s patented process to treat its ballast tanks.
37. Plaintiff offered no proof to show defendant’s actual savings from its use of the patented Smith process. Plaintiff did introduce correspondence from Bethlehem Steel Company, Clearkin Chemical Company and employees of the Government to show that significant savings were expected to result through the use of flotation compounds to preserve ballast tanks. The documents show a savings which is based on a comparison between the cost of treating ballast tanks with two-part flotation compounds on the one hand and the laborious prior art method of sandblasting and painting on the other hand.
(a) However, in the main, plaintiff’s arguments are based on a theoretical, mathematical approach. Plaintiff, for example, urges that the surface area of the ballast tanks on all the ships which defendant admits treating with Eureka compounds amounts to 1,141,440 square feet.
(b) Plaintiff then assumes, for no proof or stipulation of this point was submitted, that it would have cost defendant 73% cents to treat a square foot of ballast tank area with bituminous emulsion. Thus, plaintiff concludes that it would *198 have cost defendant $799,419 to coat 1,141,440 square feet of ballast tank area with bituminous emulsion.
(c) Plaintiff further urges that it would have taken some 127,760 gallons of Eureka two-part compounds to treat the same square foot area of ballast tanks. Thus, based on a stipulated cost of $1.25 per gallon, plaintiff calculates a cost of $159,700 for preserving the same 1,141,440 square feet of ballast tanks. Accordingly, plaintiff claims that defendant saved some $639,819 by using Eureka two-part compounds and plaintiff’s patented process to preserve its ballast tanks over what it would have cost if defendant had used the prior art bituminous coating method.
38. In addition, plaintiff claims that the documents in evidence establish defendant’s use of Eureka two-part flotation compounds on YD-33. Defendant’s documents indicate that YD-33 should not be included in the vessels or dry docks which were capable of being treated with flotation compounds, since “* * * [it is not] classified as a ship or dry-dock, but is simply a dredge, i.e., a yard craft in the same category as a barge or crane.” Plaintiff has not shown that any compounds were used in connection with dredges generally or YD-33 specifically, and no testimony or documentation was offered during the accounting trial.
Moreover, plaintiff’s only exhibit relating to YD-33 is unconvincing since it merely states, “Use [of E-220 and E-221] indicated — Amount Unknown.” Defendant’s documents likewise show that information regarding dredges was unobtainable. Particularly, defendant’s exhibit relating to YD-33 states: “Not listed — No record of use [E-220 and E-221] found.”
Based on the above, it is concluded that the evidence of record is not probative to indicate a use of Eureka compounds for preservation of the ballast tanks on YD-33.
39. Plaintiff claims that it also should be compensated for the savings which resulted from defendant’s use of its patented process to preserve the ballast tanks of LST-228 and floating dry dock ARD-29. Plaintiff calculates the ballast tank surface for ARD-29 as 138,600 square feet, and that of LST-228 as 15,090 square feet. Then, assuming again the *199 cost for bituminous coating to be 73% cents per square foot, plaintiff calculates tbe cost to defendant to coat tbe tanks to be $110,653. On tbe other hand, plaintiff claims that it would cost defendant only $32,287 for tbe 26,114 gallons of Eureka which would be necessary to preserve the same ballast tanks. Thus, plaintiff claims that defendant saved $78,366 by using its patented process for preserving the ballast tanks in question instead of the prior art bituminous emulsion.
40. Plaintiff, furthermore, contends that defendant should be accountable for all dry docks which defendant leased to commercial establishments during the relevant accounting period. Neither side introduced evidence to show (a) the number of dry docks, if any, that defendant leased to commercial establishments during the relevant years; (b) that Eureka two-part compounds were used to treat the ballast tanks of any leased dry docks during the period of interest in this proceeding; or (c) that the United States authorized its lessees to use Eureka flotation-type compounds and plaintiff’s patented process to preserve the ballast tanks of leased dry docks. Defendant did, to the contrary, introduce documents at trial which established that the responsibility for maintaining leased dry docks rests with the lessee. That evidence showed that the lessee could maintain the ballast tanks of leased dry docks by using either one-part or two-part flotation compounds or by the use of the laborious method of scraping, chipping and painting. The evidence established that the choice of maintenance, and the costs incurred, was the sole responsibility of the lessee.
It is, accordingly, found that defendant is not accountable to plaintiff for use of its patented process in preserving leased dry docks during the relevant years.
41. Plaintiff does not claim to be entitled to all the savings resulting from defendant’s use of plaintiff’s patented process. Plaintiff is willing to accept 10 percent of defendant’s savings. Accordingly, plaintiff claims that since the cost savings by defendant through the use of the patented Smith process on ARD-29 and various LST’s and LSD’s amounted to $718,185, it is entitled to compensation of $71,819.
*200 In addition, plaintiff urges that it is entitled to recover $31,915 for the Navy’s use of Clearkin two-part chemical compounds in carrying out the Smith patented process. Plaintiff also urges that interest in the form of delayed damages be paid at the rate of '6 percent for the many years that this case has been pending. However, plaintiff introduced no evidence and offered no testimony to support a 6 percent per annum rate. Finally, plaintiff urges that because of the lack of procurement records, recovery in this case should be increased by some $100,000. In sum, plaintiff claims to be entitled to $310,812.
42. Defendant urges that any interest which is awarded as delay damages should be calculated at the rate of 4 percent per annum, the rate customarily used by the court in assessing delay damages.
43. (a) As damages for unauthorized use of the patented invention, plaintiff is entitled to $25,000, calculated by applying a 5 percent royalty rate to the dollar volume of procurement (400,000x$1.25).
(b) In addition, plaintiff is entitled to interest, as delay damages, at 4 percent per annum from midway in the accounting period (March 8, 1955) to the date of payment. Delay damages for the 16 years of March 8,1955, to March 8, 1971, amount to $16,000.
Conclusion op Law
The court concludes as a matter of law that plaintiff’s reasonable and entire compensation in this case is the sum of $41,000, plus interest (on $25,000) at the rate of 4 percent from March 1, 1971, to the date of payment. Judgment is entered for plaintiff accordingly.

 Yosemite Chemical Company, through a series of mergers, is now part of plaintiff corporation.

 The date of the court’s decision on validity and infringement.

 While Clearkin Chemical Company did supply defendant with its records, for reasons stated in Findings 1, 2 and 28, they are not used in this accounting.

 The last case In which cost savings were used by this court as the basis for calculating “reasonable and entire compensation” was Shearer v. United States, 101 Ct. Cl. 196, 60 USPQ 414, cert. denied, 323 U.S. 676 (1944).

 Badowski v. United States, 150 Ct. Cl. 482, 485, 125 USPQ 656. 658, 278 F. 24 934 (1960).

 Standard Brands v. Federal Yeast Corp., 38 F. 2d 314 (4th Cir., 1930).

 Sinclair Refining Co. v. Jenkins Co., 289 U.S. 689, 697-698 (1933).

 Plaintiff withdrew claim 6 of its patent from consideration, during the infringement trial and thus no findings of fact were made relative thereto. Furthermore, claim 7 of the Smith patent was found to be invalid. Claim 7 was directed to a process which called for the application of a one-part corrosion inhibiting compound, and is thus distinguishable from claims 1-5 which required the application of two-part flotation-type compounds. With the finding that claim 7 is invalid, plaintiff admits that defendant can use Part A compounds or single-part compounds with immunity so long as Part B is not used along with Part A.

 Plaintiff, in its August 20, 1965, brief and exceptions to the trial commissioner’s July 8, 1965, report, raised substantially the same arguments it again urges as to why the use of “Corrosion Battler A” should be found to come within the invention defined by claims 1-5 of the Smith patent. The court, after carefully considering plaintiff’s arguments, agreed with the trial commissioner’s finding that Clearhin Chemical Company’s composition “Corrosion Battler A * * * is found not to come within the invention defined in claims 1 through 5 of the Smith Patent.” Nothing that plaintiff again urges is found to persuade me to in any way urge a modification of that finding.
Indeed, plaintiff’s arguments to include Clearhin two-part compounds in the accounting are, along with defendant’s attempt to belatedly raise the defense of experimental testing and use, not considered in this proceeding. As defendant correctly points out, the sole purpose of an accounting is to establish plaintiff’s “reasonable and entire compensation” and the urging of other issues, in an attempt to alter the court’s prior decision on validity and infringement, will be ignored, see Marconi Wireless Telegraph Co. v. United States, 99 Ct. Cl. 1, 65, 53 USPQ 246, 258 (1942), aff’d in part and rev’d in part on nonrelated grounds, 320 U.S. 1 (1943).